## The Edwin H. Webster.

*(District Court, S. D. New York.    December 18, 1883.)*

1. COLLISION—BURDEN OF PROOF—TUG AND TOW.
    Where two steam-tugs, each with tows, have exchanged mutual assenting signals as to the mode in which they will pass each other, and a collision afterwards ensues, the libelant's tug having the other on her own starboard hand, the burden of proof is upon the libelant to show by a reasonable preponderance of evidence that the respondent's tug was in fault, and, failing to do this, the libel should be dismissed.

2. SAME—CASE STATED.
    Where the tug E. H. W., as she was leaving her slip in Brooklyn to go down the East river, sighted the tug M., and each gave two whistles to the other, and the M. had the W. on her own starboard hand, and the question in dispute being whether the E. H. W. went beyond a reasonable distance away from the shore, near which by her signal she was bound to pass, *held,* on conflicting evidence, that it was not shown that the E. H. W. had gone out in the stream further than was reasonable, or so as to be in the way of the M., and the libel was therefore dismissed.    The tow not having sued her own tug, the question of the latter's fault not further considered.

In Admiralty.

*Edward D. McCarthy,* for libelant.

*Beebe, Wilcox & Hobbs,* for claimants.

BROWN, J.    The libel in this case was filed to recover damages for injuries to the schooner Deep River, on the twentieth of September, 1880, by a collision in the East river off North Fifth street, Brooklyn, with the tow of the steam-tug Edwin H. Webster.    The schooner was in tow of the steam-tug Merkle, and lashed upon her starboard side, and another schooner was lashed on the tug's port side.    The Merkle, with her tow, was going up the East river at about 7 : 30 P. M., with a strong flood-tide.    The Webster had in tow two scows, 160 feet long, one lashed upon each side, and was upon one of her regular trips from North Fifth street, Brooklyn, to the Erie Railroad docks, Jersey City.

The Webster had backed slowly out of the slip at North Fifth street, and swung around against the end of the upper pier as the flood-tide struck the stern of the scows.    About the time she was thus straightened down the river, and close to the pier, the Merkle and her tow were seen coming up river a little above Grand street.    The Webster signaled by two blasts of her whistle that she would pass to the left, or on the Brooklyn side, and received from the Merkle two assenting whistles in reply.    In swinging up with the tide the Webster went mostly above the North-Fifth-street pier, and as soon as her bows had swung out somewhat from the pier her engines were started ahead under a slow bell only, so that she made against the strong flood-tide, according to the testimony of all her witnesses, not over half a length down by the pier, before she commenced backing on account of the near approach of the Merkle.    As her bows were headed out somewhat, and the tide was running about four knots against her, she had worked gradually out into the river, though making scarcely any head-

way by land, while the Merkle was sweeping up towards her at the rate of about eight miles an hour. About half a minute before the collision, the captain, apprehending danger, ordered the engine to be reversed, full speed, which was immediately done; but the starboard corner of the outer scow struck the port quarter of the Deep River, about 15 feet from her stern, inflicting on the latter considerable damage. The Merkle had come on at full speed without any slowing of her engines.

The libel was filed against the Webster only, the libelant's proctor having formerly been of counsel for the Merkle. The libelant contends that the collision took place about 1,000 feet from the Brooklyn shore, and charges the responsibility for the collision upon the Webster, because she had come out into the stream so great a distance as that, after having signaled that she would go to the left, and on the Brooklyn side. The claimants contend that the Webster, at the time of the collision, was not over 150 feet from the end of the North-Fifth-street pier. The night was dark, but not thick. Both vessels had the proper lights, which were in view of each other from the time of their signal whistles. About the same time with the whistles from the Webster, an unknown tug with a tow was coming down nearer to the middle of the river than either of them, which gave the signal of one whistle to the Merkle, to which the latter replied with one whistle. The claimants contend that this latter signal was given and accepted after their own signals; the libelant contends that it was before. Whichever it was, the Merkle, by assenting to both, undertook to go between the Webster and the unknown tug. The Merkle was bound to keep out of the way of the Webster and to allow her reasonable room on the Brooklyn side, not only because she had assented to the signal of two whistles given by the Webster, but also because the Merkle had her upon her own starboard hand.

Smith, the pilot of the Merkle, who was examined a few months after the occurrence, but who died before the trial, testified repeatedly that he was 500 yards distant from the docks on the Brooklyn side when he gave his answering whistles, and the same distance at the time of the collision. He knew the Webster and the time of her usual departure upon her regular trips, and he was then expecting her. He saw her back out of her slip and swing against the pier in the manner above stated; saw "her side lights" as she lay off at the end of the pier, when she gave her two whistles; and he testifies positively that at that time he was abreast of North Second street. The captain of the Webster judged the Merkle to be off Grand street at the time of the whistles; but Smith, who was in a position to know precisely what pier he was abreast of, fixes this point considerably above Grand street, viz., abreast of North Second street. A reference to the map of Brooklyn shows conclusively that at the time of the whistles, therefore, the tugs were not over 300 yards apart, or about one-half the distance estimated by the captains of both tugs. **Three other**

witnesses for the libelant testify that at the time of the whistles, and at the collision, the Merkle was about 1,000 feet, or about 300 yards, from the Brooklyn shore. This is but two-thirds of the distance from the shore stated by Smith.

If I were satisfied that either of these estimates were even approximately correct, I should hold the Webster answerable for proceeding out an unnecessary and unreasonable distance from the shore after her signal of two whistles. A careful consideration of all the testimony, however, leads me to the conclusion that these estimates are not trustworthy, and that the Webster, though probably somewhat further out than her own witnesses assert, was not beyond the space she was reasonably entitled to, and not nearly 1,000 feet from the shore,—probably not more than half that distance.

1. As the Webster had backed out and swung around against the pier, and had there got headed down river, there was no possible reason for her going any great distance outside before passing the Merkle. That she was headed down river at the pier is proved, not only by her own witnesses, but also by Smith and the libelant's son, who both testified that at the time she blew two whistles they saw both her colored lights. On starting ahead she would necessarily put her bows somewhat to starboard to keep off the Brooklyn shore, and as soon as this was done her green light would be hid. Her own witnesses say she was thus headed off but little. This, in reality, satisfies all that is trustworthy in the libelant's testimony on this point; for though some of them swear that the Webster, after the two whistles, was seen going straight across the river, it is evident that they had no means of knowing her real direction, beyond the mere fact that the green light was hid, and that she was working out into the river, and this appearance would result equally from her steaming ahead against a strong tide, but making very little headway, with her bows only a little turned towards the New York shore. Her real motion by land was slowly nearly straight out into the river, though heading very differently. There is nothing, therefore, in the libelant's testimony on this point to weaken the force of the claimant's evidence. The rule applies here in full force, that where a vessel's witnesses are not discredited, their testimony as to their own movements is to be accepted.

2. Estimates of distance on the water at night are always untrustworthy where there are no precise landmarks, with which the witnesses are familiar, to guide them; and there were none in this case to serve as guides to the libelant's witnesses in estimating the distance from the shore. Their estimates, except Smith's, are obviously mere conjecture. One of them said it was about half-way between the buoy opposite Tenth street, New York, and North Fifth street, Brooklyn. But this estimate cannot be the result of any observation at the time, since the buoy was not lighted, and could not have been visible, as the night was dark. The distance of the buoy,

moreover, from the North-Fifth-street pier is but about 1,400 feet, and the whole width of the river to the Tenth-street pier opposite is only about half a mile. If Smith's statement of 500 yards had been correct, the collision would have taken place over the reef of rocks to the west of the buoy. There is no question, however, that the collision was much to the east of the buoy; if it was half-way between that and the Brooklyn shore, as one of the witnesses testified,—an estimate which, as I have stated, has no really trustworthy basis,—it would be about 700 feet from the North-Fifth-street pier. But there is strong reason for locating the place of the collision even nearer than this to the Brooklyn shore.

3. Upon the course on which the Webster was undoubtedly headed, and making so little headway under a slow bell against a strong tide, it is scarcely probable that she could have worked off shore as much as even 500 feet during the short time which elapsed between her signal and the collision. Capt. Smith testifies that the Merkle was going through the water at the rate of three or four knots, and that the tide runs there about four knots, and that he was going at full speed. He was going by land, therefore, at the rate of nearly eight knots, and would pass the distance of 900 feet from North Second street, where he was when the signal was given, to North Fifth street, where the collision took place, in less than a minute and a quarter. When the whistles were given, the Webster, as I have said, headed down stream. She reversed her engines and backed full speed about half a minute, as her witnesses testify, before the collision, though the time was very probably somewhat less than that, which carried her back abreast of the pier from which she started, after making less than half a length headway by land. A brief computation will show conclusively that if her bows had been headed even as much as four points, that is, halfway, across the river at the time her whistle was sounded, and she had kept on that course, she could not have made more than 300 feet further out into the river; but as at the time of the whistles she was headed straight down by the end of the pier, and was not yet swung off on this course, she must, after she had got on that course, and during the shorter time available, have made even less than 300 feet offing. Adding the width of her tow, 136 feet, and something more for her heading across, and we should still have less than 500 feet, without allowing anything for her coming nearer shore again through backing. According to the claimants' testimony she could not have been headed as much as four points off shore. There was no reason or inducement for her to be headed off so much as that, and at the collision, or when clearly distinguished by the libelant's witnesses, their evidence does not indicate that she was headed off any more than four points, nor even so much.

4. The result of these various considerations is to confirm, in the main, the account given by the claimants' witnesses. They were in a better position than the libelant's witnesses for estimating the dis-

tance from the shore. The captain of the Webster was on top of the cars, watching and giving orders, from the time the Webster left the pier. There was no conceivable reason for his doing otherwise than as he testifies,—going ahead under a slow bell, with his bows heading a little off the shore,—and the orders to back at full speed were timely and proper.

The libelant relies upon one circumstance to prove the long distance from the shore at which, as he alleges, the collision took place; namely, that in consequence of the bow-line of the Deep River being broken by the collision, her bows swung off to starboard, and the Merkle, in order to make fast again, was obliged to port her wheel and proceed toward the Brooklyn shore, and that in order thus to fetch up with the schooner's bows and go on again, the Merkle in fact made a complete circle in the river, turning round to starboard, and after such a turn proceeded up the river without coming nearer to the Brooklyn shore, as Capt. Smith says, than 150 yards. In most of Capt. Smith's evidence I find that the distances given in yards would be more nearly correct if reduced to feet; and, with that modification here, the turn to which he testifies could be accomplished within a space between 150 and 500 feet off the shore, although at first sight this might seem impossible. For as soon as the schooner's bows swung off she would present great resistance to any forward motion through the water, and the tug, being attached to her stern only, would tend to draw her stern up the river, and both forces combined would throw her bows back rapidly. To counteract this, and to reach her bows as soon as possible, the pilot would naturally at first reverse his engines in order to slacken his own speed through the water, which, he says, he did immediately after the collision. He then put his wheel to port and steamed ahead, after getting a head-line to the schooner, in the endeavor to fetch up with her bows. In thus pulling ahead upon a line attached only to the stern of the schooner, while she offered great resistance to any forward motion from her broadside being presented to the line of the tug's motion, the stern of the schooner would operate in a measure as a stationary point to which the tug was attached by a line, so that under her port wheel and forward motion the tug would swing round the stern of the schooner in a short circle, though the stern of the schooner would be all the while moving in a somewhat smaller circle. These considerations are sufficient to satisfy me that the argument of the libelant that the turn thus made could only have been effected in a long distance, rests only upon conjecture as to the amount of space required, and that in the absence of all testimony as to how much space was taken in this turn, there is sufficient reason to infer that it might have been done within the comparatively narrow space which I find upon the other testimony was available.

The burden of proof is upon the libelant to show fault. I cannot perceive that fault in the Webster has been established in this

case by any such preponderance of evidence as is necessary to entitle the libelant to recover. *The Albert Mason*, 8 Fed. Rep. 768; *The City of Chester*, 18 Fed. Rep. 603. I am quite confident from the testimony that the starboard side of her tow was less than 500 feet out in the stream; that her navigation was prudent and proper under the circumstances; and that there was nothing to prevent the Merkle's going considerably to the westward of her. The unknown tug coming down, I am satisfied, was not in her way. Immediately after her one whistle she headed for the New York shore, and passed the Merkle considerably to the west. As the Merkle was not sued, I forbear to say anything further in regard to her navigation. The only question here is whether the Webster was in fault. As I do not find any fault established, the libel must be dismissed, with costs, as in the similar case of *The Marshall*, 12 Fed. Rep. 921.